FARMERS PRODUCE CO. v. ÆTNA CASUALTY & SURETY CO.

1. INSURANCE—FIDELITY INSURANCE—QUESTION FOR JURY.

In an action on a fidelity bond against the bonded employee and the surety company, evidence that the shortage sued for was due to the dishonesty of the employee, *held*, sufficient to take the case to the jury.

2. SAME—NOTICE—WAIVER.

The claim of the surety company that it had insufficient notice of the claim under the bond, *held*, not sustained by the record, which shows that if the requirements of the bond in these respects were not fully met they were waived.

3. SAME—RULES OF STRICTISSIMI JURIS NOT APPLICABLE TO BOND ISSUED FOR PROFIT.

A surety company, issuing a fidelity bond for profit, may not evade liability thereunder by resorting to the technical rules of *strictissimi juris* applicable to gratuitous bondsmen.

[1]Fidelity Insurance, 25 C. J. § 30; [2]Id., 25 C. J. § 29; [3]Principal and Surety, 32 Cyc. p. 307.

4. SAME—EVIDENCE—ADMISSIBILITY—INSTRUCTIONS.

The admission of testimony which did not relate to the items submitted to the jury, and upon which plaintiff's claim was based, was not prejudicial error, where it had a bearing upon the veracity and good faith of the bonded employee, who was a witness, and the jury were carefully instructed as to the purpose for which it might be considered.

5. SAME — CLAIM MAY BE ESTABLISHED BY PREPONDERANCE OF EVIDENCE—CIRCUMSTANTIAL EVIDENCE SUFFICIENT.

Although, in order for an employer to recover, in an action on a fidelity bond, the dishonesty of the bonded employee must amount to criminality, it is not necessary to establish it beyond all reasonable doubt, or by direct proof; a preponderance of the evidence, which may be circumstantial, being sufficient.

Error to Kalamazoo; Weimer (George V.), J. Submitted April 27, 1926. (Docket No. 78.) Decided May 3, 1927.

Assumpsit by the Farmers Produce Company against the Ætna Casualty & Surety Company on a bond. Isaiah M. Sines was permitted to intervene as a party defendant. Judgment for plaintiff. Defendants bring error. Affirmed.

*Travis, Merrick, Warner & Johnson,* for appellant surety company.

*Jackson, Fitzgerald & Dalm,* for appellant Sines.

*Harry C. Howard,* for appellee.

STEERE, J. Plaintiff was a dealer at retail and wholesale in coal, feed, seeds, fertilizer and other farm products and necessities at Kalamazoo, Michigan. It was one of the affiliated organizations of the Michigan State Farm Bureau. Defendant Sines was plaintiff's manager from April, 1922, to August, 1923, bonded

---

[4]Fidelity Insurance, 25 C. J. § 28; [5]Id., 25 C. J. §§ 5, 29.

as to fidelity, etc., in the sum of $10,000 by the Ætna Casualty & Surety Company. The language of the surety bond particularly material in this inquiry is as follows:

"The Ætna Casualty & Surety Company, as surety for and in consideration of a premium based upon an annual rate of twenty cents per one hundred dollars of suretyship, paid or to be paid to it by the employer, hereby binds itself to pay to Michigan State Farm Bureau and affiliated organizations as their interest may appear (see indorsement), as employer, such pecuniary loss as the employer shall sustain or money or other personal property (including that for which the employer is legally responsible) through the fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, misapplication or misappropriation or any other dishonest or criminal act or omission, of or by any of the employees listed in the schedule forming part of this bond, directly or in connivance with others. * * *

"*Provided:* * * * Upon the discovery by the employer of any loss, the employer shall promptly deliver notice thereof to the surety at its home office, in Hartford, Conn., and within three months after such discovery, the employer shall file with the surety at its home office, a written statement of claim giving particulars of such loss." * * *

While managing plaintiff's business, Sines inaugurated a new system of bookkeeping. Plaintiff caused an audit of its books to be made in August and September, 1923, and found, as claimed, a cash shortage of over $5,000. The attention of the bonding company was called to this shortage and claim made that it should pay it. After considerable correspondence, this suit was brought against the bonding company. Later Sines was allowed to intervene. After plaintiff's proofs were all in, a motion was made for a directed verdict in favor of defendants, and overruled. A like motion was made at the close of all the testimony, which was also overruled. The

case was submitted to the jury, which returned a verdict in favor of the plaintiff in the sum of $4,045.13, and judgment for that amount was entered. A motion for a new trial by defendants was denied.

Defendants' 55 assignments of error are grouped in their counsel's brief as follows:

"(1) Error in the refusal of the court to direct a verdict for the defendants at the close of the plaintiff's case and again at the close of the testimony, and in denying the motion of the defendants for the direction of such a verdict.

"(2) Error in the charge of the court and the refusal of the court to charge as requested by the defendants.

"(3) Error in denying defendants' motion for a new trial and in denying its motion for a judgment notwithstanding the verdict.

"(4) Error in the rulings of the court."

Plaintiff's bill of particulars contains 51 items, and the ample testimony as to them was tedious in details. The last 6 items, amounting to $958.65, were rejected by the court.

Defendants contend there should have been a directed verdict because all of the checks and moneys claimed by plaintiff and set forth in its bill of particulars, by which it was bound, had been put into its bank account. Plaintiff denies that all the cash found its way into the bank. It admits the checks passed through the bank, but claims that Sines was too shrewd to appropriate and negotiate them so that he could be traced and, omitting to enter them in the cashbook, he sent them through the bank, then took currency in like sums out of the cash drawer; that he also gave numerous receipts for money collected by him for plaintiff which he failed to enter in the cashbook or elsewhere.

The court painstakingly submitted the case to the jury in an impartial and somewhat lengthy charge. The following excerpts, against several portions of

which errors are assigned, indicate the litigants' claims, issues raised during the trial, and general import of the court's instructions to the jury:

"The bond provides that the Ætna Casualty & Surety Company, as surety, for and in consideration of the premium which has been paid, bound itself to pay to the Michigan State Farm Bureau, and affiliated organizations, of which the plaintiff is one, such pecuniary loss as the plaintiff might sustain of money or other personal property through the fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, misapplication or misappropriation or any other dishonest or criminal act or omission, by the defendant Sines directly, or in connivance with others, while holding such position as manager.

"Plaintiff company claims that it has sustained a loss represented by the items   *   *   *   on the bill of particulars.   The bill of particulars is not evidence in and of itself.   It is a mere formal statement in writing stating the details of the claim, the items, the specific items or claim that the plaintiff company makes.   *   *   *

"The plaintiff company claims that it has sustained pecuniary loss represented by the various items, I think something near fifty in number which are stated and contained in the bill of particulars.   *   *   * You have heard during the trial some frequent reference to the last six items.   In my judgment, the plaintiff company is not entitled in any event to recover for any one of the last six items.   *   *   *

"The conduct and acts of the defendant Sines which were contemplated to be covered by the contract, *   *   *   are such as would ordinarily be of a criminal nature, that is to say, there must have been dishonesty. Inadvertence, mistake, poor bookkeeping, carelessness, negligence and such things do not form the basis for recovery in an action of this sort, on a contract of this sort.   *   *   *

"While I have just said to you that there must have been dishonesty, dishonesty amounting to criminality, it is not necessary that the plaintiff should establish that dishonesty beyond all reasonable doubt. *   *   *   And so in this case the plaintiff is not required to establish the defendant Sines' dishonesty, or

the loss of money as a result of it, beyond all reasonable doubt, but only by a preponderance of the evidence.　*　*　*

"It is the theory and claim of the plaintiff company that the defendant Sines failed to account on the books of the company for certain funds which came into his hands, or into his custody, or under his control, as manager.　*　*　*　Although it appears those checks which represented some of the items in question, all or nearly all, found their way to the credit of the plaintiff at the bank, that still they did not get into the cash accounts on the books of the company.　It is the theory and claim of the plaintiff that there is a shortage in the funds as disclosed by the audit. *　*　*　That defendant Sines received into his custody, into his hands or under his control as manager of this business certain moneys, either in cash or by checks,　*　*　*　which were not recorded, the receipt of which was not mentioned anywhere in the books of the company, and that an audit of the books discloses a shortage of funds equal to or greater than the various items contained in the bill of particulars.　*　*　*

"The defendants claim that the checks that represent all or nearly all of the items in question were actually deposited in the bank to the credit of the plaintiff company, and there seems to be no dispute about that, but the theory and claim of the plaintiff company is, that even though they did find their way to the credit of the plaintiff company at the bank, that they did not find their way into the books; that nowhere was a record made of them, and while these identical checks were not taken by the defendant Sines, it was through not recording them, through not having them go through the books, through not having any record of them, it was possible for the defendant Sines to take other funds, cash deposits of an equal amount without having it appear on the books that he was abstracting those funds at that time.　*　*　*　Now, those are the two theories.　*　*　*

"It (the verdict) cannot be against one defendant and in favor of the other defendant.　It must either be in favor of the plaintiff and against both defendants, or in favor of both defendants and against the plaintiff.　*　*　*

"The contract or bond required the plaintiff company to give notice promptly on discovery off loss. There was some question whether or not that notice was given.    The contract also required a statement of claim to be filed within three months, and it was contended that that was not done; therefore, the plaintiff company was allowed to go very extensively into all of that.    Having gone into it, mostly through correspondence, there is no dispute, no controversy about what the facts are, and in my judgment the contract has been complied with in respect to those two matters, in respect to notice and in respect to the statement of claim.    Those two matters are not for the jury, and the only question for the jury is that which I have already indicated, namely, whether a pecuniary loss was sustained by the plaintiff as a result of the dishonesty of the defendant Sines in the management of the business and in the handling of the funds, keeping of the books and records.    *    *    *

"In determining whether or not Sines was short in his accounts within the meaning of the language contained in the bond and which I have read to you, you should consider all the facts and circumstances disclosed by the evidence remaining in this case.    You should determine what items, if any, if he is short. As I have already said to you, you are limited to those shown in the bill of particulars excluding the last six items.    The amount is for you to determine not exceeding the amount already indicated, $3,760.99.

"You are not bound by the claims of either of the parties.    If you find that the plaintiff is entitled to recover, you should determine the amount, and to that amount so determined you should add interest at the rate of five per cent. from October 27, 1923, to this date.

"The defendant Sines was the manager of the business and it was his responsibility faithfully to care for and attend to the property intrusted to him as such manager, and to keep account of the funds coming into his hands so that he could account for them.    In this action both defendants are liable for any loss which this company has sustained, either for money or personal property, because not only of fraud, dishonesty, forgery, theft, embezzlement, wrong ab-

straction, but also because of misapplication or misappropriation, if any, or on account of any criminal act or omission of the defendant Sines, either directly himself or in connivance with others; and if you find that any such loss has been so sustained, you shall determine the amount and render your verdict accordingly.

"Under the language of the bond   *   *   *   it is not necessary for the plaintiff to prove directly, that is, by direct evidence the wrongdoing of the defendant Sines, or the intent of the defendant Sines to misappropriate funds.   It is not always possible to offer direct proof upon the question of intent.   *   *   * Intent is often circumstantial.   Circumstantial evidence may be as strong and convincing as direct proof. It is for you to say from all the facts and circumstances what the intervening defendant's intent was, that is, if you find that loss was sustained through his acts.

"The defendant Sines admits that the items received from Alamo and other branches, those branches so-called, were not entered in the cash account, but claims that they were deposited in the cash drawer and that the checks and cash so deposited found its way to the bank, and that thereafter the company had the benefit of those items.   It is for you to determine from all the facts in the case whether the cash account was short to the extent of those items that did not appear on the cash account, and if you find the cash account was short for those items so claimed by the plaintiff in its bill of particulars, the mere fact that those specific items found its way to the bank, the bank account, would not be sufficient standing alone to defeat the plaintiff's claim.   *   *   *

"If you find by a preponderance of the evidence that the plaintiff company has sustained a pecuniary loss through any dishonest acts or omissions on the part of the defendant Sines, within the meaning of that term as already explained and defined to you, fix the amount, not exceeding $3,760.99, add interest at five per cent. from October 27, 1923, to this date, and render a verdict for the plaintiff against both defendants accordingly.   If you do not so find, then your verdict will be generally for the defendants, no cause of action."

Defendants' first condensed assignment of errors covers refusal of the court to direct a verdict for them, which, if well taken, calls for reversal as to both defendants.

Sines submitted to the directors a trial balance on January 1, 1923, showing bills payable of $5,463.80, and "Net profit, interest on stock included $1,949.20." He made other reports which were so favorable that his salary was increased from $25 a week to $30 a week.   He was necessarily an important witness in the case and was first called by plaintiff as an adverse witness under the statute.   His direct and cross-examination extends over more than 80 pages of the record.   It is more or less vacillating and self-contradictory, and in itself tends to sustain the trial court's view that the case involved issues of fact for the jury.   Upon his examination by the court with reference to the record and his method of handling cash, the following excerpts from his testimony are illustrative:

"*Q*. Did you keep a cashbook there in your bookkeeping system?

"*A*. Yes.

"*Q*. Did that bookkeeping system embrace a cashbook?

"*A*. Yes, sir.

"*Q*. And what was the purpose of the cashbook? What did you put in it?

"*A*. I believe we got all cash sales and all cash received on account.

"*Q*. But not any cash received through these agencies set out in the account?

"*A*. Not that I remember."

On redirect-examination he said:

"Not to my knowledge, I never drew any more money than my salary."

Immediately following, these questions were asked and answered:

"*Q.* Why do you say 'not to your knowledge?' Why did you qualify it that way?

"*A.* Well, I don't remember of doing it.

"*Q.* You think you unconsciously might have taken some?

"*A.* No, sir.

"*Q.* You never took any money out of the cash drawer at all without leaving a voucher in there?

"*A.* A voucher?

"*Q.* Oh, some evidence that you had taken it. You never took a dollar out of the cash drawer in your life without leaving something in there to show that you had taken that much money?

"*A.* Not that I remember of.

"*Q.* What do you mean when you say 'not as you remember?'

"*A.* I meant just as I said.

"*Q.* When you qualify it 'not so far as you remember,' do you think sometimes you might have taken it and not remembered it, is that what you mean?

"*A.* I couldn't say as to that.

"*Q.* Well, * * * this system of bookkeeping that you introduced there was the same system that you had used with the Gleaners, wasn't it?

"*A.* Practically the same thing.

"*Q.* And if you had put a cash sale slip into the cash drawer at the time you had taken in money, there would have been a record of it on the books?

"*A.* Yes, sir, so far as I know. * * *

"*Q.* Now, when you left there you turned over as a receivable a claim against W. Van Delden of $113.59, didn't you, as shown in the personal ledger?

"*A.* According to the books it looks that way.

"*Q.* There is no question about it, is there?

"*A.* That is what the book shows. * * *

"*Q.* Anyway, it wasn't paid and it stood as a receivable against Van Delden when you left, didn't it?

"*A.* According to this book, yes.

"*Q.* And that is the book you handed over to us when you went out?

"*A.* Yes, sir.

"*Q.* Here is a Bushouse note of $11.25 you receipted for, shown in Exhibit 52; what did you do with the note?

"*A.* I don't remember whether that note is in the bank, or whether it was left down there.

"*Q.* Left where?

"*A.* Produce Company.

"*Q.* Now, calling your attention to Exhibit 47, there are two receipts, one $142.50 and the other $118.33, different dates there; there is your signature on there?

"*A.* That is my signature.

"*Q.* And you got the money, didn't you?

"*A.* Evidently.

"*Q.* Now, what did you do with the money?

"*A.* In the Produce Company.

"*Q.* Can you show it to us on the cashbook?

"*A.* I don't know as that was put on the cashbook. I will look at it. * * * May I see the recap just a minute? I don't see anything entered for that month.

"*Q.* That money isn't in?

"*A.* For that month.

"*Q.* Didn't go into the cashbooks or cash records?

"*A.* I don't find it.

"*Q.* Now, here is a receipt of yours, No. 46, for $502.97. What date did you get that money?

"*A.* I don't remember.

"*Q.* Well, you wouldn't know how to look in your cash records for it?

"*A.* If I haven't the date.

"*Q.* If you haven't the date you couldn't tell. On this Exhibit 15 the first item happens to be $502. Is that date up there in your handwriting, April 21st?

"*A.* Yes, sir.

"*Q.* Would you say that this receipt then was signed April 21; that you got the money that day?

"*A.* No, I can't say that this one was.

"*Q.* Well, now, let us see on the next page. Here is one that has a date, Exhibit 48; that is March 24. What is the total?

"*A.* $102.45.

"*Q.* This book, Exhibit 16, is your cashbook, I take it?

"*A.* That is the original cashbook. I don't find it there.

"*Q.* It isn't there, is it?

"*A.* I don't find anything. * * *

"*Q.* Well, now, I asked you about one item of $200,

May 8, 1923.    Did you find that you had drawn $200
on that day?

"*A.* That is according to that voucher record.    I
didn't see no canceled checks.

"*Q.* But according to the receipt you gave?

"*A.* Well, according to the book.

"*Q.* Now, on two days later, May 10, 1923, you paid
the Investment Company on account of the automobile
note $200, didn't you?

"*A.* I don't remember the amount.    I don't remember the date.

"*Q.* You remember once that you paid them one
payment of $200?

"*A.* Well, I don't remember the exact amounts or
I don't remember the dates.    I paid them some money
some time along in the spring.

"*Q.* Well, those moneys that you paid, you didn't
take out of the money in the bureau drawer?

"*A.* I don't remember that.    *    *    *

"*Q.* Did you draw $260 on the 30th of July?

"*A.* According to that voucher record."

His examination disclosed that his expenses were
in excess of his salary.    He claimed, and his claim
was supported by the testimony of his wife, that when
he went to Kalamazoo he had $200 in Liberty bonds
and about $1,200 in cash which he kept at home in
a bureau.    On that subject he was asked and answered:

"*Q.* Now, when you moved to Kalamazoo did you
move the bureau?

"*A.* Absolutely.

"*Q.* Did you take the money out when you moved
it, or did you let it come right along with the bureau
with the rest of the things in the bureau?

"*A.* I don't think hardly I left it in the moving van.

"*Q.* Then you remember of taking it out? .

"*A.* Absolutely.    *    *    *

"*Q.* When you got down here in Kalamazoo did you
open up a bank account?

"*A.* I don't think so right away.

"*Q.* Well did you at any time?

"*A.* Yes, I had a bank account here at one time, a small bank account.

"*Q.* Where was it?

"*A.* First National, I think.

"*Q.* Well, now, when you opened up that bank account did you take any of this $1,200 out of the bureau drawer and put it in the bank account?

"*A.* I don't remember as to that.

"*Q.* Well, have you any way of telling us about how much there was when you moved here in October, 1922, in the bureau drawer?

"*A.* No, I don't; I don't recall.

"*Q.* Were the Liberty bonds in the bureau drawer too?

"*A.* I think so.

"*Q.* Were they registered?

"*A.* I don't know that.   *   *   *

"*Q.* Well, these Liberty bonds were on hand when you moved up here in October?

"*A.* Yes, sir.

"*Q.* By the way, did you keep them right on through?

"*A.* No, they was cashed in later on.

"*Q.* Cashed in, about when did you cash those in?

"*A.* I don't remember.   *   *   *

"*Q.* When you moved to Kalamazoo how much money did you have that you left in the bureau drawer?

"*A.* I don't remember exactly.

"*Q.* Have you any way of telling us about how much?

"*A.* No, probably—maybe ten or eleven hundred dollars; I wouldn't say for sure; maybe $1,200 altogether.

"*Q.* Now, on October 5, 1923, you bought an automobile of Kelser & Brophy, didn't you?

"*A.* Somewhere along that date.   *   *   *

"*Q.* Closed car, glass sides to it, you paid how much for it?

"*A.* I don't remember; around eight or nine hundred dollars, I would say.

"*Q.* Now, part of that was a trade-in of your old car, wasn't it?

"*A.* Yes, sir.   *   *   *

"*Q.* You kept the money in the bureau drawer and you bought the car and paid—and gave notes and paid interest on it, while the money was in the bureau drawer drawing no interest, is that right?

"*A.* Absolutely."

Auditor Hill pointed out and testified that the audit showed a shortage in the cash during Sines' management of something like $4,000. We have quoted but a small part of his testimony, but enough, we think, to show that the court was justified in declining to direct a verdict, at least in favor of Sines.

It is claimed he should have directed a verdict in favor of the bonding company because notice of the particulars of the shortage was not given within the time prescribed by the bond. The first communication from plaintiff to the surety company with reference to the discovery of the shortage was sent to John F. Daly, its claim agent at Grand Rapids, on October 27, 1923. It reads as follows:

"A recent audit of the books of our corporation discloses a shortage in our cash. Our manager, Mr. I. M. Sines, was bonded through your company for $10,000, and we wish to file a claim against your company for the sum of $3,760.99. The above claim is supported by canceled checks and receipts to customers."

That letter brought no immediate response and the following letter was sent to the same place on November 28, 1923:

"A claim was made by the Farmers' Produce Company against your company for the sum of $3,760.99 on October 27, 1923. We have had no reply to our letter. We ask that you consider the claim immediately and make proper adjustment. Notice is hereby given that the claim for $3,760.99 may not cover all the loss that you might be liable for and that another claim may be filed."

Walter L. Rector, secretary and manager of plain-

tiff, who sent the two above-quoted communications received the following from Daly, dated December 11, 1923:

"Replying to your letter of November 28th, beg to state that I submitted claim made by the Farmers' Produce Company to the home office, and they advise that unless you can produce some evidence showing that Mr. Sines through some act covered by the bond is responsible for the shortage, there would be no liability. If you are in a position to show that the shortage was due to the acts of Mr. Sines covered by the bond, and will furnish us with a statement in detail, setting forth the date, nature of transactions and amount involved, we will be very glad to consider the claim.

"From my investigation it appeared that any shortage was due to the poor system in use at Kalamazoo,. which system had been complained of many times to the directors. However, if you can satisfy me that our investigation is not correct, we will be glad to give the matter further consideration."

Touching the subject of these communications, Rector testified as follows:

"*Q.* Was there any complaint made at any time to the directors when you were present there about the system?

"*A.* There was not. * * *

"*Q.* Now, Mr. Rector, * * * you sent in an itemized statement to Daly at the time you sent that original letter?

"*A.* Yes, sir, I think I did.

"*Q.* As to whether or not it aggregated the amount mentioned in the letter?

"*A.* Yes, sir, I think it did. * * * With that letter I will say that I am positive, pretty sure. Looking at it again, I will say I did."

Daly testified that a notice had been in his hands. On cross-examination he said:

"I think what Mr. Rector sent me, I inclosed in the letter and only kept copies of my letter; but I am not

sure.    The point is, I am not sure how that notice was received; I am sure though that I received a list of claims, I am positive."

Later he testified with reference to a meeting held on January 24, 1924, that:

"We finally arranged that the matter should stand *in statu quo* until such time as I could report and get something back."

There seems to have been no serious effort on the part of Daly to quibble about the receipt of notice at that time.    He apparently had sent to the home office and it had received the itemized statement prepared by Auditor Hill for, on November 19, 1923, Charles H. Olano, an adjuster at the home office of the defendant company, wrote Daly in part as follows:

"We have your letter of the 6th, inclosing notice of claim received from the obligee and your memoranda of October 18th and 31st of the interviews with the parties interested."

After the meeting of January 24, 1924, and Daly had written the home office concerning it, he received a reply dated February 18, 1924, reading in part:

"If it can be shown that the checks were not deposited to the obligee's account, it would tend to establish his claim against our principal.    Also furnish evidence for criminal prosecution.    You should advise the obligee that we have no intention but to treat with them fairly in the settlement of this case, and that it is not the practice of the company to resort to any technical defenses to avoid the payment of just claims, and that as soon as our investigation is completed we will promptly advise them our position in the matter."

The contents of this letter were communicated in substance to plaintiff's attorney, who later received a letter from Daly, under date of May 16, 1924, saying:

"In accordance with my promise to you, I beg to

advise I am in receipt of a letter from the home office this date stating that the company must decline to assume any liability under the bond until it is determined by the court."

Upon inquiry as to the necessity of a proof of loss, Daly wrote plaintiff's attorney on May 29, 1924, as follows:

"Replying to your letter of May 28th, beg to state not having a copy of this particular bond I cannot state definitely regarding the proof of loss, but in my opinion a proof of loss is not necessary as we have a statement from Auditor Hill showing the amount claimed."

The court, in admitting this communication over objection, summarized the pertinent testimony of Auditor Hill as follows:

"You see Mr. Hill has already testified, gentlemen, that he met Mr. Daly October 9th and that he had his schedules, or list, or statement, his figures with him, his bill of particulars, so-called, statement of claim, itemized statement, and presented it to Mr. Daly at that time, exhibited it to him anyhow.  This letter has a tendency to corroborate and confirm Hill's testimony.  It is receivable upon that theory, if for no other purpose."

While being cross-examined with reference to the company's denial of liability, Daly gave the following testimony:

"We made a general denial because I thought you couldn't prove any of it, and not on the ground that we didn't have any formal proof of loss."

We have quoted enough to show that the requirements of the bond as to notice and as to the claim were fully met, or at least, if not fully met, were waived.   See *Hohn* v. *Casualty Co.,* 115 Mich. 79; *Hummer* v. *Casualty Co.,* 181 Mich. 386, 401; *Rott* v. *Insurance Co.,* 218 Mich. 576.   The evidence of waiver is to be considered in the light of the fact

that defendant surety company issued this bond as a business transaction for profit. It cannot, therefore, resort to the technical rules of *strictissimi juris* as a gratuitous bondsman. *City of Grand Rapids v. Krakowski*, 207 Mich. 483.

It is insisted the court erred in admitting certain testimony which did not directly relate to the items submitted to the jury. Without reviewing that testimony at length, we are of opinion that it had a bearing upon the question of Sines' veracity and good faith. The jury were carefully instructed as to the purpose for which it might be considered and we do not find its admission was prejudicial error.

While appellants insist that Sines fairly accounted for all the items that came into his hands, we first find the outstanding fact that he should have put them on the cashbook and did not. There is testimony tending to show that cash and checks were given to Sines to pay outstanding bills of various amounts for which he gave receipts and not only failed to put the items in the cash account but continued to carry the debts which had been paid to him on the books as bills receivable. The audit showed during his administration there was an actual shortage in the cash of over $4,000. We think the court correctly charged the jury as to that feature of the case.

Complaint is made because the court did not give certain of defendants' requests. We have already quoted quite at length from the charge, but it was much longer than we have quoted. We think it covered the substance of all proper requests and fairly advised the jury as to all material issues of fact involved. The case was exhaustively tried by able counsel and is well briefed. We have examined with care the many assignments of error but find no novel questions of general interest presented which would justify further protracting this opinion by reviewing them.

We are unable to conclude that the verdict was excessive, and find in the rulings of the court and its instructions to the jury no prejudicial error demanding reversal.

The judgment will stand affirmed.

SHARPE, C. J., and BIRD, SNOW, FELLOWS, WIEST, CLARK, and MCDONALD, JJ., concurred.