L. A. Andrew, State Superintendent of Banking, Appellant, v. Hartford Accident & Indemnity Company, Appellee.

February 12, 1929.

John Fletcher, Attorney-general, and *Kenline, Roedell, Hoff-mann & Tierney*, for appellant.

*Charles Grilk* and *Hurd, Lenehan, Smith & O'Connor*, for appellee.

DE GRAFF, J.—The defendant (appellee) issued its fidelity bond in favor of the Farmers State Bank of Dyersville, Iowa, covering the following named officers and employees of the said bank: John A. Schnieders, $15,000; Joseph C. Sudmeier, $10,000; Victor White, $5,000; John B. Domayer, $10,000. By the terms of said bond, said defendant company bound itself to pay to the said bank such pecuniary loss as the bank should sustain through the fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, misapplication, or misappropriation, or any other dishonest or criminal act or omission of or by any of the employees listed in the schedule forming part of this bond, directly or in connivance with others, while such employees hold any position at any location in the service of the employer, during the period commencing upon the date each employee is listed hereunder, and continuing in amounts scheduled, until the termination of this insurance.

The language of the bond clearly shows its intent and meaning. The bond does not agree to indemnify for mere negligence or inadvertent conduct or loss by or through errors of judgment, but does contemplate dishonest, fraudulent, or criminal acts. The bond in suit is a form of insurance; and the liability of the defendant fidelity company is limited to a "loss" sustained by the insured "by reason of the thing insured against." *Birrell v. Fidelity & Cas. Co.*, 193 Iowa 860.

The bank, at the time of the commencement of this suit, was insolvent, and in the hands of the superintendent of banking of the state of Iowa, as receiver. The plaintiff-receiver in its

substituted petition specifically alleges seventeen items of misconduct on the part of the bonded employees while said bond was in full force and effect, and that said bonded employees, colluding and conspiring together, fraudulently and wrongfully abstracted, misapplied, and misappropriated money and other personal property which belonged to said bank, and for which said bank was responsible, and that, by reason of said specified acts, the Farmers State Bank suffered pecuniary loss.

We do not deem it necessary to make specific mention of these various items herein, as such a history would make the opinion of undue length. It is sufficient to state that the first sixteen items of plaintiff's specifications have to do with negotiable paper, chiefly promissory notes, which it is claimed were paid by the makers respectively and the proceeds thereof did not find their way into the assets of the bank. The seventeenth item involves the balance of proceeds of the sale of a certain parcel of real estate, which proceeds were fraudulently misapplied.

This appeal, by reason of a directed verdict in favor of the defendant company upon the conclusion of plaintiff's testimony, involves certain pertinent and vital questions. Did the bonded employees of the Farmers State Bank, either individually or by concert of action, commit any acts within the purview of the bond by reason of which the receiver of said bank may predicate this cause of action? Did the plaintiff, when it rested, establish a prima-facie case of conspiracy, as between two or more of the bonded employees? Did the Farmers State Bank suffer a pecuniary loss by reason of the alleged acts charged in the petition?

It is obvious that a proof of conspiracy was not essential to recovery. Conspiracy is important only to charge each of the participants in it with responsibility for the acts of the others  in carrying out its purpose. In fact, it was not necessary to charge the existence of conspiracy. If it is charged and not proved, the plaintiff may show, by other evidence, guilty participation of certain of the bonded employees, and would be entitled to judgment against the one or more whom plaintiff proves to be guilty. *Dickson v. Young*, 202 Iowa 378; *Young v. Gormley*, 119 Iowa 546; *People v. Small*, 319 Ill. 437 (150 N. E. 435). In other words, damages for a joint wrong are recoverable in the absence

of proof of a conspiracy, even though a conspiracy is alleged, for the reason that the averment of a conspiracy in the petition does not ordinarily change the nature of the action nor add to its legal force and effect. *Dickson v. Yates*, 194 Iowa 910, 913. Further mention of this matter will be presently made.

A few general observations relative to this case are permissible at this point. This court will take judicial notice of all the provisions of the Code of Iowa. It will take notice of the statutes governing the acts or omissions of the employees of corporations, including bank employees, with respect to the keeping of records, books, etc. Section 8404, Code of 1924 (Section 1641-g, Code Supplement, 1913), makes criminal the making of false statements, reports, etc., as to the affairs and pecuniary conditions of a corporation.

The Farmers State Bank was a corporation organized under the laws of the state of Iowa. Sections 9282 and 9283, Code of 1924 (Sections 1887 and 1888, Code of 1897), govern the making of false entries in the books of banks, the exhibition of false papers with intent to deceive, the diversion of the funds of a bank to other objects than those authorized by law; the deceiving of the public or individuals in relation to the means (resources, assets, etc.) or liabilities of the bank.

In consideration of the foregoing provisions, we are to determine whether the acts or omissions alleged to have been committed by the bonded employees of said bank are within the scope of the acts and omissions which are specifically referred to in the bond issued by the defendant company, and further, whether or not such acts and omissions caused a loss to the bank, thereby making the defendant bonding company liable. It will be presumed that an intentional omission to make an entry in the books of a bank which, in effect, produces the same result as though a false entry had actually been made, is equivalent to the making of a false entry.

Let us suppose that a bank officer or clerk, with intent to deceive, receives a payment from a customer on a promissory note, and credits such payment to some other account, or omits to make any credit whatever of such payment on the books of the bank. This act or omission would produce a false showing of the "means and liabilities" of the bank, and is within the

purview of the statutes heretofore cited. It is evident, therefore, that any intentionally wrongful entry or omission to make an entry on the books of the bank for the purpose of deception comes within the scope of the words "or any other dishonest or criminal act or omission," as set out in the bond in question, and that, when such act or omission has been committed by a person covered by such bond, and a pecuniary loss to the bank results from such acts or omissions, clearly a prima-facie case has been made out against the bonding company.

In the instant case, the record discloses that a number of promissory notes were received from customers by the bank, which notes represented loans by the bank to the respective makers of said notes. A proper debit entry was made on the books of the bank, showing bills receivable in the amount of the notes received, and a corresponding credit in cash. These notes, with interest, were finally paid by the respective makers, but no entry was made showing the transaction, and the bills receivable account, so far as these notes were concerned, remained the same, although the officer of the bank receiving the payment gave a receipt of payment to the maker, and placed what is called a "credit slip" in the drawer, or on a spindle which, in fact, constituted no part of the bookkeeping of the bank. The books did balance, of course, and if the proper debit of cash and the proper credit of bills receivable had been made, there would still be a daily balance of the books. However, had the bank debited the cash, and allowed the bills receivable account to remain the same as to these notes, the books would not have balanced, and the assets of the bank would have been increased by the amount of the proceeds of the notes.

Some importance has been placed on the act of indorsing on the back of the notes partial payments made thereon. This, however, avails nothing. A promissory note is merely the evidence of the debt of its maker; and while such note may be considered as an asset of the bank which holds it, the note could in no manner constitute a part of the books of the bank. The heretofore cited sections have nothing to do with the making of indorsements of payments on the notes. The fact that notes upon which payments are made are not in possession of the bank at the moment, has nothing whatever to do with the matter. If

these notes had been rediscounted, the discount register should have so shown, and cash would have been debited.

We are not apprised why these notes were not surrendered to the makers thereof at the time of payment, except that, in two or three instances, the maker, upon the payment of his note, was told by the bonded officer with whom he was dealing that the note was not then in the bank's possession, but would be delivered to him later. Where the notes were, we do not know; but it is shown that, when the receiver took charge of this insolvent bank, these paid notes were found in the bills receivable account, as live assets of the bank's. The statute contemplates that entries are to be made on the books of the bank. How could a bank examiner, whose duties are defined by law, determine the true condition of the bank without bank books, correctly setting forth its transactions? Any false entry intentionally made, for the purpose of deceiving as to the assets or liabilities of such bank, is a crime; and it must follow that an omission to make an entry, with the same purpose in view, is in the same category. It is equivalent to the making of a false entry. The record facts show that the omission on the part of the bonded officers and clerks of the bank to make these entries of payments on the books of the bank would tend to deceive not only the persons who had the authority to examine the bank's books, but other persons who might have the same right. In other words, as to these particulars a jury question was presented, which means that the jury had the right to determine whether the omissions were intentional and for the purpose of deceiving, and were, therefore, in violation of law, and within the scope of the bond in question.

The evidence clearly shows that these bonded officers in certain cases received money in payment of certain notes specified in the petition. In other cases, checks were received on the deposit accounts of the makers, and such checks were charged to such deposit accounts, thus producing the same result as though money had been handed to the officer by the maker of the note. In other cases it is shown that checks on other banks were offered by the note makers and received, and that such checks were either cashed by the Farmers State Bank or were placed to its credit by the bank upon which they were drawn.

The latter methods produced the same result as though the party making the payment had paid in actual cash.

The bonded officers and clerks in question were, therefore, in this position: They received money, or what represented money, that was to be applied in payment on notes which the bank held as part of its assets. The records, or, strictly speaking, the books of the bank, contained no entries that such payments had been made. It is also shown that the money or proceeds of the checks given in payment of the notes do not appear on the books of the bank as having gone into the assets of the bank.

A bank may have in its possession money or property which does not belong to it. The books of the bank must be used as evidence as to what belongs to it and what does not. If there is  no evidence in the books and records that such cash or property belongs to the bank, then it may be assumed that, in the absence of other evidence, the bank does not own such cash or property. In this connection, it may be stated that a witness, Mr. Boyer, who was the examiner in charge of the bank during part of the receivership, carefully examined the records and books of this bank. He was an expert in matters of bookkeeping, and, after detailing his examination of the books, to determine the true condition of the bank, stated, as the result of his examination, that the various payments made to bonded officers of the bank "did not come into the assets of the Farmers State Bank, as shown by the books and records of the bank." This evidence was competent, and therefore admissible. As a matter of fact, neither the principal books nor the subsidiary books, such as the teller's blotters, show that the payments made on the notes in money or checks went into the "cash" of the bank. The evidence terminates with a showing that the payment was last in the hands of the officer to whom it was paid by the note maker.

Can it be said that the money paid to an officer and unaccounted for on the books of the bank is among the assets of the bank? Clearly, if said officer has failed or omitted to account for it, then such person must account for it. The evidence further discloses that credit slips or tickets were made out and kept somewhere in the bank at the time each of these notes was paid by the note maker. These slips are but "memos," and cannot be viewed as any part of the books of the bank. There is no evi-

dence that these credit slips were taken into account in balancing the books of the bank, and the most that can be said for these "pieces of paper" is that they are evidence of where certain credits should be entered in the books, and not evidence that any such credit as stated thereon has been actually applied, or that any funds have come into the bank. The filling out of a ticket or slip—no matter what its purpose may have been—would in no case change the fact that the money had not been properly accounted for, and would *prima facie* constitute a violation of the statute. The credit slips, in the absence of credit entries in the books, must be discarded, as immaterial and incompetent. The credit slip or "memo" does not pay any obligation. Neither does it give credit. It is simply an indication of what might, should, or would be done. The banking laws of this state, as well as the common practice among all properly managed banking institutions, denote that books must be kept, and that such books must show the actual transactions and condition of the bank at all times. It would be idle and presumptuous to hold that the records or books of the bank could be kept in the minds of the officers and clerks. Permanent records and books are contemplated, and that correct and honest entries will be made therein.

There is evidence that the money and substitutes for money paid to these bonded officers were in the hands of these persons in the first instance. Not one of them, or the instant defendants, can remain silent, and compel the plaintiff in this case to find the money or substitute therefor, or to trace the same, or discover how it was spent, before a charge of embezzlement, wrongful abstraction, or misappropriation can be established. The books of the bank are in evidence. They do not show the receipt of the money or substitutes from the bonded officers who received it in their hands from the payer. The bank must, of necessity, be operated through human agencies. It cannot receive except through a human agency, and these officers and clerks were the human agencies through which the bank operated. If one of these officers or clerks acted as a part of the human agency through which this bank could operate, did receive money, and did not pass it into the books of the bank, then the bank has sustained a loss by the misapplication, misappropriation, or fraud

of the officer or clerk then and there acting. It is for this very purpose that the bond in this case was procured by the bank.

Chicken feathers found clinging to the coat of an alleged thief, when such feathers have been identified as of the class of the fowl stolen, are competent evidence to prove his guilt. It is not necessary to produce a witness to the actual theft, or to trace the trail of the thief to where he killed the chicken or otherwise disposed of it. In the case at bar, we have these bonded officers with the proceeds of payment traced to their hands. There is no evidence as to how or where or when this money or substitutes therefor left their possession.

We turn once more to the conspiracy phase of this case as alleged by plaintiff, and it is quite apparent from the evidence that the practice of holding out or misapplying the payment on notes was common to all of these officers. Domayer, himself, testified:

"Whenever we handled a note of this kind and it was paid, it was the practice in the bank to make a credit slip for that purpose. We had a place for the items (credit slips) that were taken in at one window. If we were waiting on a customer at that particular window, we were in the habit of putting them on a spindle; but if we were waiting on someone at another window, we didn't put them on that spindle,—we would lay them aside, and put them some place else."

The record shows that Domayer and White received payments on notes and gave receipts for such payments. Schnieders knew about it, for the reason that duplicates of such receipts were held in the bank and signed by him. Sudmeier, the assistant cashier, knew about the practice. They acted in concert, and consequently we hold that a prima-facie case of conspiracy was established by the plaintiff, and the cause should have been submitted to a jury.

Did the bank sustain any loss by reason of the procedure heretofore indicated? If money in one account is applied in payment or to cover up a loss occasioned by another transaction, then per se that loss has been balanced, and there remains no loss from the prior transaction. If a bank official makes a bad loan, and a loss occurs thereby, that loss is established. If, to conceal that loss, the officer then misapplies or misappropriates other

funds of the bank, and makes payment to balance that loss, that loss has been balanced, and there is no loss on account of the prior transaction. Can the officer then defend himself with the answer that, while he misapplied, misappropriated, or even stole the money, in the second instance, the bank did not lose anything, because what he misapplied, misappropriated, or stole went into the bank's assets? By his act in the second instance, he canceled the loss in the first instance. The loss sustained by the bank then results directly from the second instance, and under the terms of the bond in this case, would constitute a claim against the surety.

It is true that the statutes of this state do not prescribe the exact manner in which books of banks shall be kept, nor indicate the exact headings of all accounts which shall appear in such books; but they do contemplate, and, by implication at least, prescribe, that books shall be so kept as to show the actual transactions and affairs of the bank. If the bills receivable account does not show from day to day the bank's assets therein, then the account is false. If these officers are responsible for the failure to make proper entries on the books of the bank, thereby showing an incorrect status as to the bills receivable account, then a deception may be inferred.

In rediscounting notes with other banks, it is a common practice of banks to carry such transactions under the heading of rediscounts. It is entirely proper to credit the bills receivable account with all of the notes that have been rediscounted, and debit the rediscount account with them. However, on account of the liability of the bank on the rediscounted notes, this practice is not always adopted. The evidence in this case does not show that any rediscount account was opened on the books, but there was a bills receivable account.

It requires no expert in accounting to trace any one of the particular items set out in the petition of the plaintiff, in order to determine that the funds paid into the hands of the officers named in the instant bond to be applied on the notes did not get on the bank books. If any of the funds did eventually find their way into the assets, then it was a misapplication of those funds, as it may be inferred that such misapplication was with intent on the part of the officers named in the bond to cover up the true condition as to assets and liabilities. Such misapplication *per se*

constituted a loss to the bank on the accounts to which such funds should have been applied.

Let us study one of the items in plaintiff's petition, as illustrative of all items of like character. Let us take Item No. 10, which involves John M. Neuhaus. The facts disclose that, on June 13, 1921, Neuhaus borrowed $6,000 from the bank, as evidenced by his promissory note, bearing 6 per cent interest, and due March 1, 1924. Indorsements on the note show that interest thereon was paid in full to March 1, 1924. The maker gave the bank $2,000, represented by a check on the Luxemburg Savings Bank, dated March 1, 1924, which check shows by indorsements thereon that such check was paid to the Farmers State Bank on the same day. Neuhaus also paid $360 interest to the Farmers State Bank on that date, but whether in cash or by check is not disclosed. He received a receipt for the $2,000 payment, to apply on his note. The "note and interest paid register" shows that credit was given for the interest paid, in the sum of $360, but no entry thereon shows a credit for $2,000. On said date, to wit, March 1, 1924, the said register shows that $20,018.37 had been received by the bank as payment on notes, and that $2,702.04 had been paid in interest on notes. The amount of $20,018.37 did not contain the payment of $2,000 made by Neuhaus. The amount so received, of $20,018.37, on March 1, 1924, was carried to the teller's blotter. The interest received, of $2,702.04, was also carried to the teller's blotter, and this amount included the $360 interest paid by Neuhaus. The same exhibit shows that new discounts of $5,265 were made on March 1, 1924. It thus appears that the bills receivable account underwent a change in balance on that date of $14,753.37.

On the opening of March 1, 1924, the bank had "commercial and real estate loans," $2,133,236.19. At the end of the day, the "commercial and real estate loans" were shown to be $2,118,482.82. This is exactly $14,753.37 less than the opening figures. It is thus seen that the $2,000 payment made by Neuhaus was not applied to the payment of the note, nor was any account given proper credit for the payment. It will be seen that the daily balance for the general accounts balanced to a cent on each day, namely: Opening and closing of March 1, 1924.

If the bank had received the $2,000 which the evidence shows was paid to the transacting officer, then the balance in

cash or some other account would have been excessive, and the books would have been out of balance. If this particular money went into the cash, or some other account; then any person with ordinary bookkeeping knowledge would know that some other money (assets of the bank) must have been abstracted. See *Webster City Sav. Bank v. Massachusetts B. & I. Co.*, 203 Iowa 1264. Direct evidence of the use of the funds is not essential. The failure to account makes a jury question. *Farmers Produce Co. v. Aetna Cas. & Sur. Co.*, 238 Mich. 405 (213 N. W. 685).

Any of the other specifications made by the plaintiff in the petition may be traced in a similar manner, and with the same result: that is, that the money paid on the notes was misapplied, misappropriated, or by other dishonest act or omission kept from the resources of the bank. This necessarily produced a loss to the bank through such misdeeds, and it was for the jury to determine, from all the evidence, the motive and purpose of the transactions in question, and to fix the loss, if any, suffered by the bank.

Certain minor questions are presented by appellant on this appeal, to which we will make brief reference. Plaintiff moved to strike from the defendant's answer the allegation that none of  the bonded officers benefited from the transactions set out in the plaintiff's petition, and also to strike from the defendant's answer the statement, "nor did the same render this defendant liable under its said bond covering the officers of said bank," and also to strike the allegation, "defendant denies that any of the officers covered by the bond of this defendant received any benefit from the transaction," and "that there was any fraud or misappropriation of any kind by the officers of said bank." These motions to strike were overruled. They should have been sustained. Under our system of pleading, the facts under which a defense is based are required to be stated. Mere conclusions are not permissible. It was immaterial whether any or all of the bonded officers benefited personally by the transactions. See 7 Corpus Juris 799, Section 691:

. Several propositions of error have to do with rulings on the evidence; but, in the light of the statements relative to the subject-matter, as contained in the opinion herein, we deem it unnecessary to rule specifically the points involved.

The defendant's motion for a directed verdict at the close of plaintiff's testimony should have been overruled. The judgment entered is—*Reversed.*

ALBERT, C. J., and STEVENS, MORLING, and WAGNER, JJ., concur.